IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. JOHNSON

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

ANTOINE C. JOHNSON, APPELLANT.

Filed November 5, 2024.    No. A-23-841.

Appeal from the District Court for Hall County: JOHN H. MARSH, Judge. Affirmed.

Antoine C. Johnson, pro se.

Michael T. Hilgers, Attorney General, and Nathan A. Liss for appellee.

RIEDMANN, Chief Judge, and MOORE and BISHOP, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Antoine C. Johnson appeals from the order of the Hall County District Court denying his motion for postconviction relief without holding an evidentiary hearing. We affirm.

## II. BACKGROUND

### 1. CONVICTION AND SENTENCE

In 2021, Johnson was convicted by a jury of one count of attempted second degree murder, one count of first degree assault, one count of discharge of a firearm in a city of the first class, and three corresponding counts of use of a deadly weapon (firearm) to commit a felony; the district court sentenced him to an aggregate sentence of 35 to 60 years' imprisonment. See *State v. Johnson*, 31 Neb. App. 207, 979 N.W.2d 123 (2022). As set forth in this court's previous opinion, the evidence adduced at Johnson's jury trial was as follows.

On May 27, 2020, Johnson, along with Gary Zierke III, Roy Rodriguez, and April Hardy, traveled from Lincoln, Nebraska, to Grand Island, Nebraska. . . . [T]rial testimony generally indicated that Johnson and Zierke were looking to purchase methamphetamine in Grand Island. The four individuals left between 9 and 10 p.m. Rodriguez drove a Chevrolet Trailblazer, while Hardy, his "fiancee" of 20 years, sat in the front passenger seat; Johnson and Zierke rode in the back seat. Rodriguez and Hardy were familiar with both Johnson and Zierke, but Johnson and Zierke were not acquainted with each other.

The group arrived in Grand Island between 11 p.m. and midnight, and Zierke directed Rodriguez to a residence belonging to his cousin, Ricardo Aguilar. Tara Aguilar, a cousin to both Ricardo and Zierke, also lived at this residence. After finding a place to park, Zierke entered the residence. Approximately 15 minutes later, Johnson exited the Trailblazer and knocked on the door. A "young lady" answered and "gestured" Johnson inside. He was directed toward a bedroom wherein he found Zierke, Tara, and Ricardo talking amongst themselves. The three were "alarmed" by Johnson's entry, although Johnson apologized and explained that it was a misunderstanding. Ricardo told Johnson to "get out" of his home, and he, along with Zierke, proceeded to escort Johnson outside. Zierke and Ricardo went back inside, but Zierke came out again a few minutes later. Johnson gave Zierke the money pooled to purchase methamphetamine, and Zierke again went inside the residence.

At some later point, unbeknownst to Johnson, Zierke left with Tara and her two daughters in a borrowed vehicle. Ricardo and his girlfriend subsequently left the residence, and Johnson approached the two, wanting to know where Zierke was. . . . [T]estimony indicated that Johnson was frustrated due to the delay in Zierke's return. Ricardo, Rodriguez, and Hardy observed Johnson to have something underneath his shirt, and Ricardo believed Johnson to be carrying a firearm. Ricardo informed Johnson that Zierke had left with Tara just a few minutes prior. After a brief exchange, Ricardo entered the Trailblazer, followed by Johnson, although the record is conflicted as to whether Ricardo did so voluntarily.

At Johnson's urging, Ricardo called Tara to find out where Zierke had gone. Either Tara or Zierke answered, and Ricardo directed Rodriguez as he drove to meet up with Tara and Zierke. The two groups met near an intersection, parking near each other. Johnson and Zierke left their respective vehicles and approached each other. Johnson demanded that Zierke return his money, and the subsequent argument ended when Johnson drew a revolver and fired one shot at Zierke, striking him in the head. Eyewitness accounts conflict as to what transpired between Johnson and Zierke during this encounter, and we note that Johnson claimed that Zierke "sprint[ed]" toward Johnson in a threatening manner while yelling that he was "going to beat [Johnson's] fucking ass." At some point during the exchange, Ricardo ran from the Trailblazer, but he returned to the scene after Johnson shot Zierke. Following the shooting, Johnson ran back to the Trailblazer, and he, Rodriguez, and Hardy drove off. Tara subsequently contacted law enforcement, and Zierke was taken to a hospital for emergency treatment.

Johnson, Rodriguez, and Hardy, headed back to Lincoln following the shooting. As they drove, Johnson repeatedly made statements such as "[Y]'all don't know who I am"

- 2 -

and "[Y]ou don't know me." On the way back to Lincoln, a Nebraska state trooper initiated a traffic stop of the Trailblazer. During the stop, Johnson, who was seated in the back seat, fled from the vehicle through a nearby field. The trooper unsuccessfully pursued Johnson and returned to the Trailblazer a few minutes later. Rodriguez and Hardy were placed under arrest, and law enforcement discovered a gun underneath the vehicle's driver's seat. Approximately 16 hours later, law enforcement arrested Johnson.

*Id.* at 211-13, 979 N.W.2d at 129-31.

## 2. DIRECT APPEAL

Johnson, represented by his same counsel, filed a direct appeal claiming that the district court erred in (1) taking judicial notice of the population of Grand Island and admitting exhibit 53 (containing a picture of a sign designating Grand Island's population, and multiple pages from the website of the U.S. Census Bureau), (2) failing to disqualify Tara from testifying due to the State's failure to disclose her cooperation agreement pursuant to the court's discovery order, (3) not allowing Ricardo's prior convictions into evidence, (4) admitting evidence under Neb. Rev. Stat. § 27-404 (Supp. 2019) regarding an incident in the courthouse during the course of trial, and (5) imposing consecutive sentences on counts VII (discharge of a firearm in a city of the first class) and VIII (use of a deadly weapon to commit a felony), in violation of the Double Jeopardy Clause because they are "double punishment" for the same crime. This court affirmed Johnson's convictions and sentences on direct appeal. See *State v. Johnson*, 31 Neb. App. 207, 979 N.W.2d 123 (2022). Johnson's petition for further review was denied by the Nebraska Supreme Court. The mandate was issued on September 12, 2022.

## 3. POSTCONVICTION

### (a) Motion for Postconviction Relief

On August 10, 2023, Johnson, pro se, filed a verified motion for postconviction relief. In his 52-page motion, Johnson made seven claims. First, Johnson claimed that "[his] right to Effective Assistance of Counsel was violated due to Appellant Counsel's failure to bring on direct appeal a claim of Ineffective Assistance of Trial Counsel due to Trial Counsel's failure to perform in accordance with [Johnson's] right to remain silent during post-Miranda interview, presenting harmful evidence, and causing a conflict of interest." He argued that during trial, his trial counsel cross-examined Investigator Collamore and elicited evidence of Johnson's "post-[Miranda] uncooperativeness and unwillingness to answer questions . . . which was harmful." And "Investigator Collamore's testimony on cross-examination that Johnson was uncooperative, didn't say much and didn't answer questions, after meeting with the police, after the shooting was the evidential straw that broke the back of his credibility camel." Johnson claimed there was "a reasonable probability that, but for his counsel's deficiency in eliciting the harmful testimony . . . the jury would have acquitted Johnson on all charges." Johnson also "noted that the Court held that the State may not impeach a defendant's exculpatory testimony by mentioning defendant's post-[M]iranda silence at the time of arrest," yet "trial counsel impeached his own client in eliciting this evidence, which created a conflict of interest."

Second, Johnson claimed that "[his] right to Effective Assistance of Counsel was violated due to Appellant Counsel's failure to bring on direct appeal a claim of Ineffective Assistance of Trial Counsel due to Trial Counsel's failure to seek a continuance to review plea agreement not turned over until shortly before trial . . . for purposes of impeachment of State witness and motive." Johnson alleged that on the first day of trial, his trial counsel requested that the district court preclude Tara Aguilar from testifying because counsel had just recently been informed about a cooperation agreement between her and the State (a copy of the agreement was provided to trial counsel 4 days earlier), but the court denied the motion to exclude the testimony. Johnson argued that trial counsel should have sought a continuance, as that is the "preferred remedy" and, if granted, would have given counsel adequate time to prepare to impeach the testimony with the agreement and attack the witness' credibility.

Third, Johnson claimed that "[his] right to Effective Assistance of Counsel was violated due to Appellant Counsel's failure to bring on direct appeal a claim of Ineffective Assistance of Trial Counsel due to Trial Counsel's failure to present exculpatory evidence through an effective cross-examination." Johnson argued that during trial counsel's cross-examination of Roy Rodriguez, counsel "failed to focus any attention at all on the 'arguing' that went on between Johnson and Zierke but instead focused on whether or not Zierke reached toward his pocket before Johnson fired a shot," even though Johnson testified that he did not see Zierke make the action. If trial counsel had "focused on the 'arguing,'" counsel could have elicited evidence of Zierke threatening Johnson, "which could have [led] Johnson to fear for his safety befor[e] Johnson fired the shot," and there would have been a "reasonable probability that the jury would have acquitted Johnson on all charges determining that he acted in self-defense."

Fourth, Johnson claimed that "[his] right to Effective Assistance of Counsel was violate[d] due to Appellant Counsel's failure to bring on direct appeal a claim of Ineffective Assistance of Trial Counsel due to Trial Counsel's failure to present evidence for purposes of impeachment of certain witnesses and furthering the credibility of Johnson." Johnson stated that "at trial there was a dispute of the space between the two vehicles involved in this incident," a Honda CRV and a Chevy Trailblazer; he specifically noted the differences in the testimony of Tara Aguilar, Rodriguez, and himself. Johnson argued that "by examination of Investigator Collamore," who had reviewed surveillance video, "[trial] counsel could have easily proved that Johnson did not get out of the car" at either of the locations testified to by Tara Aguilar and Rodriguez. "[H]ad counsel presented this evidence to the jury it would have impeached Rodriguez and Tara Aguilar's testimony that Johnson approached Zierke, then shot him," and "it would have bolstered the credibility of Johnson's claim that the vehicles were overlapping, which would give logic to Johnson's explanation of being 'trapped' in the door jam as Zierke approached him in a menacing manner, yelling threats before Johnson fired in self-defense."

Fifth, Johnson claimed that "[his] right to Effective Assistance of Counsel was violated due to Appellant Counsel's failure to bring on direct appeal a claim of Ineffective Assistance of Trial Counsel due to Trial Counsel's failure to investigate evidence for the purposes of impeachment of certain witnesses and furthering the credibility of Johnson." Johnson stated that during his review of the discovery, he learned that the police department obtained surveillance video footage from a specific residence, and the footage included three camera angles. However, the copy of the surveillance footage provided to Johnson only contained two camera angles "and

one angle is cut short at 12:00 midnight." Johnson claimed that prior to trial he asked trial counsel to investigate the missing footage, but that counsel did not do so. Johnson alleged that the "full copy of surveillance footage" "could have been used to impeach Rodriguez and Tara Aguilar's testimony" concerning the location of the two vehicles prior to the shooting; the evidence also could have bolstered Johnson's testimony "that the cars were side by side which would give logic to Johnson's explanation of feeling trapped before firing a shot." Johnson claimed that his trial counsel was deficient in not investigating the missing camera footage and that had the camera footage been presented to the jury "there is a reasonable probability that there would have been doubt in [Johnson's] guilt."

Sixth, Johnson claimed that "[his] right to Effective Assistance of Counsel was violated due to Appellant Counsel's failure to perfect an appeal on multiple issues after being directed to do so by [Johnson]." Johnson alleged that he informed his counsel he wanted to raise multiple issues on appeal, including: (1) "Abuse of discretion by the court in allowing Investigator Collamore to sit at the prosecutor's table throughout the trial, when he was a sequestered witness"; (2) "Abuse of discretion by the court in allowing speculative testimony and conclusional [sic] testimony by Investigator Collamore to be admitted"; (3) "Abuse of discretion by the court in allowing Investigator Sullivan to make opinion in an area that he was not qualified to make"; (4) "Prosecutorial Misconduct make misleading statements about witnesses testimony"; (5) "Prosecutorial Misconduct making misleading statements about law and evidence concerning the case"; (6) "Prosecutorial Misconduct stating personal opinions"; (7) "Prosecutorial Misconduct inflaming prejudice and exciting the passions of the jury"; (8) "Prosecutorial Misconduct withholding evidence"; and (9) "Prosecutorial Misconduct improper vouching and commenting on evidence not in front of the jury." According to Johnson, he was informed that counsel would not raise the issues on appeal. Johnson claimed that counsel was "negligent" in not raising the listed issues on appeal, and counsel's deficiency "deprived Johnson of his right to appeal." And when asserting a claim of ineffective assistance of counsel "for failing to perfect an appeal after being direct[ed] to do so, it is not necessary to show prejudice."

Seventh, Johnson claimed that "[his] right to Due Process was violated due to the prosecutor's discovery violation." Johnson alleged that prior to trial, he learned that the police obtained surveillance from a specific address, and that the surveillance footage contained three camera angles; however, the copy provided to Johnson contained "only two angles and one angle [was] cut short at 12 midnight." Johnson further alleged that the "full copy of surveillance footage" "could have been used to impeach Rodriguez and Tara Aguilar's testimony" concerning the location of the two vehicles prior to the shooting; the evidence also could have "bolstered Johnson's testimony that the cars were side by side which would give logic to Johnson's explanation of feeling trapped before firing a shot." Johnson claimed that he was prejudiced by the prosecutor's failure to disclose this exculpatory and impeachment evidence, and had Johnson had the opportunity to present the evidence to the jury "there is a reasonable probability that there would have been doubt of Johnson's guilt and the results of the proceeding would have been different."

Additionally, Johnson argued that "even if each of his individual claims are insufficient to support post-conviction relief, then the cumulative effect of all the claims resulted in an unfair trial requiring post-conviction relief."

(b) Denial Without Evidentiary Hearing

In its order entered on October 16, 2023, the district court denied Johnson's motion for postconviction relief without an evidentiary hearing. The court noted that Johnson was represented by the same counsel at trial and on direct appeal. As to claims 1 through 5, the court stated that "[t]hese allegations are framed as failing to bring certain issues on direct appeal." However, claims of ineffective assistance of counsel raised on direct appeal by the same counsel who represented the defendant at trial are premature and will not be addressed on direct appeal. See *State v. Dunster*, 278 Neb. 268, 769 N.W.2d 401 (2009). The court found that Johnson's claimed appellate issues would have been premature and he could not show prejudice by his counsel's failure to raise such issues.

However, "[t]o the extent that Johnson's claims are treated as raised in this proceeding," the district court addressed them as follows.

Claim 1. Johnson fails to address what post-Miranda statements were elicited or how such statements were prejudicial.

Claim 2. Johnson's counsel raised the issue regarding the witness's plea agreement on direct appeal. The Court of Appeals found that Johnson was not prejudiced by the State's delay in turning over the cooperation agreement with the witness. . . .

Claim 3. Johnson fails to specify the nature of any exculpatory evidence which could have been presented through a proper cross-examination or why his counsel's cross-examination was not proper.

Claim 4. Johnson fails to specify the nature of any impeachment evidence or evidence bolstering the credibility of the defendant which could have been offered.

Claim 5. Johnson fails to allege the manner in which trial counsel failed to investigate or the nature of any evidence which additional investigation might have disclosed.

Claim 6. The record refutes Johnson's claim 6[,] as Johnson's attorney timely perfected an appeal. . . .

Claim 7. Much of Johnson's argument regarding this claim relates to strategies by his defense counsel. Johnson fails to identify the exculpatory or impeachment evidence withheld by the State. To the extent it refers to the witness' cooperation agreement, as previously noted, the Court of Appeals found that Johnson was not prejudiced by the delayed disclosure.

The district court found that Johnson's claims alleged only conclusions of law or facts and/or the files and records of the case affirmatively showed he was entitled to no relief.

Johnson, pro se, appeals.

III. ASSIGNMENTS OF ERROR

Johnson assigns as error the same seven claims he made in his motion for postconviction relief set forth above, along with his claim that the "cumulative effect" resulted in an unfair trial; we therefore do not repeat them here. Johnson also asserts that the district court abused its discretion in denying him relief on his claims.

## IV. STANDARD OF REVIEW

In appeals from postconviction proceedings, an appellate court reviews de novo a determination that the defendant failed to allege sufficient facts to demonstrate a violation of his or her constitutional rights or that the record and files affirmatively show that the defendant is entitled to no relief. *State v. Lessley*, 312 Neb. 316, 978 N.W.2d 620 (2022).

Whether a claim raised in a postconviction proceeding is procedurally barred is a question of law. *Id.* When reviewing a question of law, an appellate court reaches a conclusion independent of the lower court's ruling. *Id.*

## V. ANALYSIS

### 1. GENERAL PRINCIPLES OF LAW

Postconviction relief is available to a prisoner in custody under sentence who seeks to be released on the ground that there was a denial or infringement of his or her constitutional rights such that the judgment was void or voidable. *Id.* Thus, in a motion for postconviction relief, the defendant must allege facts which, if proved, constitute a denial or violation of his or her rights under the U.S. or Nebraska Constitution, causing the judgment against the defendant to be void or voidable. *Id.* The district court must grant an evidentiary hearing to resolve the claims in a postconviction motion when the motion contains factual allegations which, if proved, constitute an infringement of the defendant's rights under the state or federal Constitution. *Id.*

However, the allegations in a motion for postconviction relief must be sufficiently specific for the district court to make a preliminary determination as to whether an evidentiary hearing is justified. *Id.* An evidentiary hearing is not required on a motion for postconviction relief when (1) the motion does not contain factual allegations which, if proved, constitute an infringement of the movant's constitutional rights rendering the judgment void or voidable; (2) the motion alleges only conclusions of fact or law without supporting facts; or (3) the records and files affirmatively show that the defendant is entitled to no relief. *Id.*

When a district court denies postconviction relief without conducting an evidentiary hearing, an appellate court determines de novo whether the petitioner has alleged facts that would support the claim and, if so, whether the files and records affirmatively show that he or she is entitled to no relief. *Id.* The appellate court does not conduct this review sua sponte, however; as with all appeals, the alleged errors of the lower court must be both specifically assigned and specifically argued in the brief of the party asserting the errors to be considered by the appellate court. *Id.* The appellate court will not scour the record on appeal to understand unclear arguments or find support for broad conclusions. *Id.*

Generally, a motion for postconviction relief cannot be used to secure review of issues that were or could have been litigated on direct appeal. *Id.* However, when, as here, the defendant is represented both at trial and on direct appeal by the same counsel, the defendant's first opportunity to assert ineffective assistance of trial counsel is in a motion for postconviction relief. *Id.*

To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense. *State v. Lessley, supra*. To show that counsel's performance was deficient,

the defendant must show counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law. *Id.* To show prejudice under the prejudice component of the *Strickland* test, the defendant must demonstrate a reasonable probability that but for his or her counsel's deficient performance, the result of the proceeding would have been different. *State v. Lessley, supra*. A reasonable probability does not require that it be more likely than not that the deficient performance altered the outcome of the case; rather, the defendant must show a probability sufficient to undermine confidence in the outcome. *Id.* The likelihood of a different result must be substantial, not just conceivable. *Id.* The two prongs of this test may be addressed in either order, and the entire ineffectiveness analysis should be viewed with a strong presumption that counsel's actions were reasonable. *Id.*

In Nebraska, a pro se party is held to the same standards as one who is represented by counsel. *State v. Devers*, 313 Neb. 866, 986 N.W.2d 747 (2023).

### 2. Ineffective Assistance of Counsel

The State points out that, "As alleged in Johnson's postconviction motion and in his brief to this court, Claims 1 through 5 are all raised as layered claims of ineffective assistance of counsel, i.e., that Johnson's appellate counsel on direct appeal was ineffective for failing to raise claims of ineffective assistance of trial counsel." Brief for appellee at 17. The State argues that "[a]n evidentiary hearing was not warranted on any of these five claims because they could not have been raised on appeal, as a matter of law, so Johnson cannot show that his appellate counsel was ineffective for failing to raise them on direct appeal." *Id.* The State also argues that even if claims 1 through 5 were intended to be raised as claims of ineffective assistance of trial counsel, they were not raised as such. Thus, "appellate counsel claims . . . are the only claims before this court." *Id.* at 20.

The State is correct in that the ineffective assistance of trial counsel claims could not have been brought on direct appeal because Johnson was represented both at trial and on direct appeal by the same counsel. See *State v. Dunster*, 278 Neb. 268, 769 N.W.2d 401 (2009) (claims of ineffective assistance of counsel raised on direct appeal by same counsel who represented defendant at trial are premature and will not be addressed on direct appeal). See, also, *State v. Lessley*, 312 Neb. 316, 978 N.W.2d 620 (2022) (when defendant represented both at trial and on direct appeal by same counsel, defendant's first opportunity to assert ineffective assistance of trial counsel is in motion for postconviction relief). But in his postconviction motion, and in this appeal, Johnson does not assert the ineffective assistance of trial counsel, instead he asserts the ineffective assistance of appellate counsel. Even if Johnson had properly raised claims 1 through 5 as claims of ineffective assistance of trial counsel, those claims would still fail as we will explain.

### (a) Claim 1 – Post-*Miranda* Silence and Conflict of Interest

Johnson assigns as error that "[his] right to Effective Assistance of Counsel was violated due to Appellant Counsel's failure to bring on direct appeal a claim of Ineffective Assistance of Trial Counsel due to Trial Counsel's failure to perform in accordance with [Johnson's] right to remain silent during post-Miranda interview, presenting harmful evidence, and causing a conflict of interest." *Id.* at 3. And the district court "abused its discretion when it denied Johnson's claim, stating that Johnson failed to address what post-Miranda statements were elicited or how such

statement were prejudicial, and, also, not weighing on whether Johnson suffered from a conflict of interest." *Id.*

In his motion for postconviction relief, Johnson claimed that during the cross-examination of Investigator Collamore, trial counsel "elicited evidence of Johnson's post-[Miranda] uncooperativeness and unwillingness to answer questions, . . . which was harmful and contrary to Counsel's strategy" and if trial counsel had deposed Investigator Collamore prior to trial, then counsel would have known "to stay away from the line of questions." And "Investigator Collamore's testimony on cross-examination that Johnson was uncooperative, didn't say much and didn't answer questions, after meeting with the police, after the shooting was the evidential straw that broke the back of his credibility camel." Johnson claimed there was "a reasonable probability that, but for his counsel's deficiency in eliciting the harmful testimony . . . the jury would have acquitted Johnson on all charges." We find that Johnson's allegations are conclusory and do not warrant an evidentiary hearing. See *State v. Lessley, supra*. Johnson also stated that trial counsel's impeachment of his own client "in eliciting this evidence," created a conflict of interest. Again, we find this allegation conclusory and not warranting an evidentiary hearing. *Id.*

### (b) Claim 2 – Continuance to Review Cooperation Agreement

Johnson assigns as error that "[his] right to Effective Assistance of Counsel was violated due to Appellant Counsel's failure to bring on direct appeal a claim of Ineffective Assistance of Trial Counsel due to Trial Counsel's failure to seek a continuance to review plea agreement not turned over until shortly before trial . . . for purposes of impeachment of State witness and to show motive for false testimony." Brief for appellant at 4. And the district court "abused its discretion in denying Johnson's claim, stating the Court of Appeals found that Johnson was not prejudiced by the State's delay in turning over the cooperation agreement with the witness . . . and not considering whether Johnson was prejudiced by Trial Counsel failure to seek a continuance to prepare [an] effective cross-examination." *Id.* It is clear in both Johnson's motion for postconviction relief and in his brief on appeal that it was Tara Aguilar's cooperation agreement that was at issue.

Johnson argues that trial counsel should have sought a continuance to have "adequate time to prepare a defense to impeach Tara Aguilar through presentation of her plea agreement showing . . . motive for her false testimony." Brief for appellant at 27. However, in this court's previous opinion, we stated that "the fact that Tara was receiving a benefit in exchange for her testimony was brought to the jury's attention by both the State and Johnson during Tara's testimony." *State v. Johnson*, 31 Neb. App. 207, 221, 979 N.W.2d 123, 135 (2022). Thus, Johnson could not show prejudice by trial counsel's failure to seek a continuance, because the jury had already been informed that Tara was receiving a benefit in exchange for her testimony, and it could draw its own conclusion as to her motive for testifying and weigh her credibility accordingly. This claim of ineffective assistance of trial counsel fails.

### (c) Claim 3 – Failure to Present Exculpatory Evidence

Johnson assigns as error that "[his] right to Effective Assistance of Counsel was violated due to Appellant Counsel's failure to bring on direct appeal a claim of Ineffective Assistance of Trial Counsel due to Trial Counsel's failure to present exculpatory evidence through

cross-examination." Brief for appellant at 5. And the district court "abused its discretion when it denied Johnson's claim stating that Johnson failed to specify the nature of any exculpatory evidence which could have been presented through a proper cross-examination or why his counsel's cross-examination was not proper." *Id.*

In both his motion for postconviction relief and in his brief on appeal, Johnson argues that trial counsel failed to present exculpatory evidence, i.e., testimony from Roy Rodriguez that Zierke's words and actions were threatening towards Johnson before Johnson fired a shot. Johnson asserts that if the jury had been presented this evidence from someone other than Johnson, then there was a reasonable probability that the jury would have acquitted him on all charges determining that he acted in self-defense.

At trial, on direct examination by the State, Rodriguez testified that after Johnson and Zierke got out of the vehicles they were in, Zierke and Johnson "ran toward each other then they started arguing." Rodriguez said, "All I heard is cussing, and then I didn't really look. . . . I just heard." "I was just listening to them argue and it sounded like it was getting more escalated; then that's when I looked back and then that's when it happened, right at that time," "I seen the -- the fire -- the -- the light, the -- the bang from the gun" and Zierke "fell to the ground"; Rodriguez "assumed" that Johnson shot Zierke. After Johnson got back into Rodriguez' vehicle, "[Johnson] was just chanting saying, y'all don't know who I am," "[y]'all don't know who the fuck -- you guys never heard nothing or seen nothing," "[y]ou just shut up and take me back to Lincoln." Rodriguez asked Johnson why he shot Zierke, but "[Johnson] just said, y'all -- y'all don't know who I am, better keep your mouth shut."

On cross-examination, Johnson's trial counsel questioned Rodriguez further about what happened after Johnson and Zierke got out of their vehicles.

Q [by Johnson's counsel] Okay, and you saw Zierke reach toward his pocket, correct?

A [by Rodriguez] Huh-uh.

Q Do you remember your deposition?

A Yes, actually, I did.

Q Okay.

A Or, yeah.

Q Where was Zierke standing when he reached into his pocket?

A By the driver door.

Q Okay.

A Or, yeah, about the driver door.

Q Okay. How soon after Zierke reached into his pocket did you hear the pop?

A I don't remember. Like I said, time -- I kind of just froze. I just -- I don't remember really time.

Q Okay, but you saw Zierke reach in his pocket, and then you heard a pop?

A I seen him grab towards his pocket, not reach in it.

. . . .

Q Grab towards his pocket, and then at some point you -- what -- what -- what happened next, did you see anything after that?

A They were arguing. I seen a flash.

- 10 -

Q Okay, and at some point you saw [Johnson] reach toward his jacket, correct?

A He had his jacket -- his hand in his jacket almost the whole time.

Q That was after Zierke reached towards his pocket, wasn't that right?

A No, I don't -- I don't remember.

. . . .

A Because he was faced toward me, then all I seen is a pop.

Q Do you remember your deposition?

A No.

Q Do you remember saying that Zierke reached toward his pocket first, then -- then [Johnson] reached toward his jacket?

A No. I was scared.

Q Can you see what I have here?

. . . .

Q What page is that?

A 129. 129.

Q And do you see the question there that says, did they go to their pockets at the same time, did Zierke reach first, did [Johnson] reach first? Do you see that?

A Yes. Yes.

Q Okay, and do you see an answer below that?

A Like I said, my mind might have been scattered for that.

Q Do you see an answer below that? Where it says, A? Can you read that for us, that answer to that question?

A That he reached in his pocket? I said, Yeah. I might have said that. Like I said, my mind wasn't clear.

Q. So you see that the answer to that question is, they almost did it at the same time, maybe a little early, Zierke reached toward his pocket first, then [Johnson] reached toward his saying -- his jacket, saying, who the fuck do you think I am? Do you see that?

A. Yeah. Like I said, I don't really remember.

Johnson's trial counsel also asked Rodriguez about a phone conversation that occurred prior to the two vehicles arriving at the scene where the shooting occurred; Johnson was a passenger in the vehicle driven by Rodriguez, as was Ricardo Aguilar (Zierke's cousin, who may not have been in the vehicle voluntarily).

Q [by Johnson's counsel] Do you remember in your deposition saying that you heard Zierke through the phone yelling at [Johnson]?

A [by Rodriguez] Yeah. Yeah.

Q Do you remember what he was yelling?

A He was saying don't -- I remember, don't mess with his fucking family.

Q Okay.

A I may not have said that to the sheriff or the officer, but I do remember that now. Said nobody messes with his family.

Q . . . [D]o you remember saying that he said, you fucking nigger, who the fuck do you think you are? This is my fucking family you're fucking with?

- 11 -

A Yes. Yes.

On postconviction, Johnson argues that trial counsel failed to present exculpatory evidence, i.e. testimony from Roy Rodriguez that Zierke's words and actions were threatening towards Johnson before Johnson fired a shot, when such evidence would have supported Johnson's claim that he acted in self-defense. However, trial counsel did present the evidence that Johnson claims that counsel failed to present. Trial counsel was able to establish that prior to arriving at the scene of the shooting, Zierke yelled at Johnson over the phone, telling Johnson not to mess with his family. During direct examination, Rodriguez testified that upon arrival at the scene of the shooting, but before a shot was fired, Zierke and Johnson ran towards each other and were arguing. Johnson's trial counsel was able to confront Rodriguez with his previous testimony that Zierke reached for his pocket first. Based on our review of the record, Johnson cannot show that he was prejudiced by trial counsel's cross-examination of Rodriguez. Accordingly, this claim of ineffective assistance of trial counsel fails.

(d) Claims 4 and 5 – Failure to Present and Investigate
Evidence for Impeachment and Credibility Purposes

Johnson assigns as error that "[his] right to Effective Assistance of Counsel was violated due to Appellant Counsel's failure to bring on direct appeal a claim of Ineffective Assistance of Trial Counsel due to Trial Counsel's failure to" "present evidence" and "investigate evidence" "for purposes of impeachment of certain witnesses and furthering the credibility of Johnson." Brief for appellant at 5-6. And the district court "abused its discretion when it denied Johnson's claim[s] stating that Johnson failed to specify any impeachment evidence or evidence bolstering the credibility of the defendant which could have been offered," and "failed to allege the manner in which Trial Counsel failed to investigate or the nature of any evidence which additional investigation might have disclosed." *Id.*

In his brief on appeal, Johnson argues only that "testimony from Investigator Collamore" regarding his review of surveillance video would have impeached the testimony of Tara Aguilar and Roy Rodriguez, and bolstered Johnson's testimony, regarding the placement of the car Johnson got out of before firing a shot at Zierke. Brief for appellant at 31. But Johnson's brief does not specifically state what Investigator Collamore's testimony would have been.

Similarly, Johnson argues that trial counsel "failed to investigate evidence, which is the surveillance video" and that such evidence would have impeached the testimony of Tara Aguilar and Roy Rodriguez, and bolstered Johnson's testimony, regarding the placement of the car Johnson got out of before firing a shot at Zierke. Brief for appellant at 33. Johnson notes that prior to trial he was "only provided two camera angles and one camera angle was cut short," and that he obtained a "full copy of surveillance footage" after his trial. However, in his appellate brief Johnson does not specifically state what that that surveillance footage showed.

Because of the lack of specificity in Johnson's appellate brief, his allegations are conclusory and do not warrant an evidentiary hearing. See *State v. Lessley*, 312 Neb. 316, 978 N.W.2d 620 (2022).

### (e) Claim 6 – Failure to Raise Claims on Direct Appeal

Johnson also assigns as error that "[his] right to Effective Assistance of Counsel was violated due to Appellant Counsel's failure to raise multiple issues/claims, after being directed to do so by the defendant, on direct appeal." Brief for appellant at 7. And the district court abused its discretion when it denied Johnson's claim "stating that Johnson's attorney timely perfected an appeal, and not determining whether Johnson was prejudiced by his counsel's negligence in not raising the multiple issues/claims Johnson directed counsel to raise." *Id.*

In his motion for postconviction relief, Johnson set forth specific issues that he allegedly informed counsel to raise on direct appeal. He argued that counsel's failure to raise such issues effectively deprived him of his right to appeal and it was "not necessary to show prejudice" under such circumstances. However, Johnson's counsel did file a direct appeal and therefore prejudice is not presumed. See *State v. Assad*, 304 Neb. 979, 938 N.W.2d 297 (2020) (when claim is made that appellate counsel was ineffective for raising some issues rather than others, U.S. Supreme Court has made clear that prejudice must be shown). In his motion for postconviction relief, Johnson did not attempt to demonstrate prejudice. Accordingly, this claim of ineffective assistance of counsel was properly denied without an evidentiary hearing.

### 3. DISCOVERY VIOLATION

Johnson assigns as error that his "right to Due Process was violated due to the Prosecutor's discovery violation, when the Prosecutor failed to disclose [in full] video surveillance obtained from [a specific address] during initial police investigation." Brief for appellant at 8. And the district court "abused its discretion when it denied Johnson's claim stating that Johnson fails to identify the exculpatory or impeachment evidence withheld by the State." *Id.* at 8. However, it is clear from Johnson's motion for postconviction relief that he was aware that he did not have all of the surveillance footage prior to trial. He stated that in his review of the State's discovery, he learned that the police had obtained surveillance footage (from three angles). However, the copy of the video provided to him contained "only two angles and one angle is cut short at 12 midnight." After trial, Johnson was able to obtain the full copy of the surveillance footage from the police department. Because this issue could have been raised on direct appeal, it is procedurally barred. See *State v. Harms*, 315 Neb. 445, 996 N.W.2d 859 (2023) (motion for postconviction relief cannot be used to secure review of issues that were known to defendant and were or could have been litigated on direct appeal).

### 4. CUMULATIVE EFFECT

Finally, Johnson assigns that the cumulative effect of all of his claims resulted in an unfair trial and that he is entitled to postconviction relief. Because we have already found that all of his ineffective assistance of counsel claims fail, and his remaining claim was procedurally barred, we conclude that his cumulative effect claim also fails.

### VI. CONCLUSION

For the reasons stated above, we affirm the order of the district court denying Johnson's motion for postconviction relief without holding an evidentiary hearing.

AFFIRMED.